## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HAN SHIN, derivatively on behalf of INOVIO PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> JACQUELINE E. SHEA, PETER KIES, SIMON X. BENITO, ROGER D. DANSEY, ANN C. MILLER, JAY P. SHEPARD, DAVID B. WEINER, WENDY L. YARNO, and LOTA S. ZOTH, <br><br> Defendants, <br><br> and <br><br> INOVIO PHARMACEUTICALS, INC., <br><br> Nominal Defendant. | Case No.: 2:26-cv-01426 <br><br><br> **DEMAND FOR JURY TRIAL** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

### <u>INTRODUCTION</u>

Plaintiff Han Shin ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Inovio Pharmaceuticals, Inc. ("Inovio" or the "Company"), files this Verified Shareholder Derivative Complaint against Jacqueline E. Shea ("Shea"), Peter Kies ("Kies"), Simon X. Benito ("Benito"), Roger D. Dansey ("Dansey"), Ann C. Miller ("Miller"), Jay P. Shepard ("Shepard"), David B. Weiner ("Weiner"), Wendy L. Yarno ("Yarno"), and Lota S. Zoth ("Zoth") (collectively, the "Individual Defendants," and together with Inovio, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Inovio, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution

under Sections 10(b) and 21D of the Exchange Act against Defendants Shea and Kies. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Inovio, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Inovio's directors and officers from October 10, 2023 to December 26, 2025, both dates inclusive (the "Relevant Period").

2.      Inovio is a Delaware corporation based in Plymouth Meeting, Pennsylvania, chiefly engaged as a clinical-stage biotechnology company. The Company's business focuses on the development and subsequent commercialization of various DNA-based treatments, particularly treatments and preventative care for Human Papillomavirus ("HPV")-associated diseases, cancer, and other infectious diseases.

3.      Inovio's products consist of two categories: DNA plasmids and its proprietary CELLECTRA® devices. The Company's DNA plasmids carry the genetic information necessary to induce the desired immune response in the patient, while the CELLECTRA® devices transfer such DNA plasmids into the patient's body.

4.      The Company's lead product candidate is known as INO-3107 and is intended for use as a treatment against recurrent respiratory papillomatosis ("RRP"). Throughout the Relevant Period, the Individual Defendants repeatedly emphasized the Company's attempts to receive accelerated approval and/or priority review from the U.S. Food and Drug Administration ("FDA") for the Biologics License Application ("BLA") of INO-3107 as a treatment for RRP (the "INO-3107 BLA"). Moreover, during the Relevant Period the Individual Defendants continued to assert the Company's ability to achieve a rolling submission of the INO-3107 BLA by the second half of 2024.

5.      Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements, pertaining to the INO-3107 BLA accelerated approval timeline as well as its approval in general. For example, on January 3, 2024, the Company issued a press release pertaining to its intention to submit a BLA for INO-3107 for the purposes of treating RRP (the "January 2024 INO-3107 Press Release"). The January 2024 INO-3107 Press Release quoted Defendant Shea as stating "***[b]ased on productive discussions with the FDA, we believe we now have established a path to submitting a BLA for INO-3107 under the accelerated approval program***," and that "***[o]ur plan is to complete the submission of our BLA in the second half of 2024*** and request a Priority Review."[1]

6.      The truth began to emerge on August 8, 2024, after the market closed, when the Company issued a press release to announce its financial results for the second quarter of 2024 (the "Q2 2024 Press Release"). The Q2 2024 Press Release quoted Defendant Shea as stating that "as part of the testing process required for BLA submission, ***we've recently identified a***

---

[1] Unless otherwise stated, all emphasis is added.

*manufacturing issue with the single use disposable administration component of our device that we believe is resolvable, but will take additional time to rectify[.]*"

7.    That same day, after the market closed, the Company hosted an earnings call to discuss its financial results for the second quarter of 2024 with investors and analysts (the "Q2 2024 Earnings Call"). During the Q2 2024 Earnings Call, Chief Medical Officer ("CMO") Michael Sumner stated that "we have unfortunately run into a manufacturing issue with a component of our CELLECTRA device[,]" and that "[t]he additional time needed for completing this work and testing has extended our anticipated timeline for BLA submission to mid-2025."

8.    On this news, the price per share of the Company's common stock fell $0.27, or approximately 3.1%, from a price per share of $8.71 at the close of trading on August 8, 2024, to close at $8.44 per share at the close of trading on August 9, 2024. Market analysts took swift notice of the Company's disclosures, with at least two analysts reducing their price targets for the Company's stock.

9.    However, despite this partial emergence of the truth, the Individual Defendants continued to make false and misleading statements to investors regarding the true nature of the INO-3107 BLA.

10.    For instance, on March 18, 2025, the Company issued a press release to report its financial results for the fourth quarter and full year 2024 (the "Q4 2024 Press Release"). The Q4 2024 Press Release quoted Defendant Shea as stating that "*[w]e continue to believe that INO-3107 has the potential to be the preferred product candidate offering durable clinical benefit, tolerability and a patient-centric dosing regimen and are moving forward with urgency.*"

11.    The truth finally emerged on December 26, 2025, before the market opened, when the Company issued a press release announcing a development regarding the INO-3107 BLA

4

timeline (the "December 2025 INO-3107 Press Release"). The December 2025 INO-3107 Press Release reported that "the [FDA] accepted the company's [BLA] for INO-3107 for review as a potential treatment for adults with RRP. ***The review classification designated by FDA is Standard.***" Moreover, the December 2025 INO-3107 Press Release disclosed that "***[i]n the file acceptance letter, the FDA noted as a potential review issue its preliminary conclusion that the company has not submitted adequate information to justify eligibility for the accelerated approval pathway.***"

12.     On this news, the price of the Company's stock fell $0.56 per share, or approximately 24.5%, from a close of $2.29 per share on December 26, 2025, to close at $1.73 per share on December 29, 2025.

13.     During the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by making and/or causing the Company to make a series of materially false and misleading statements which failed to disclose, *inter alia*, that: (1) the Company failed to maintain internal controls; (2) as a result, the Company lacked sufficient research to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (3) the INO-3107 BLA would be unlikely to receive accelerated approval or priority review from the FDA; (4) INO-3107's financial prospects were greatly exaggerated; and (5) as a result, the Company's overall financial assertions were inaccurate. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

14.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while two of the Individual Defendants engaged in improper insider sales, netting total proceeds of ***approximately $276,363.***

15.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

16.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Pennsylvania (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars. The Company has been substantially damaged because of the Individual Defendants' knowing or reckless breaches of their fiduciary duties, and other misconduct.

18.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Shea's and Kies' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

23.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Pennsylvania or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

24.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

25.    Plaintiff is a current shareholder of Inovio. Plaintiff has continuously held Inovio common stock since first purchasing shares on August 12, 2020.

26.    Plaintiff is a citizen of Illinois.

### Nominal Defendant Inovio

27.    Inovio is a Delaware corporation with principal executive offices at 660 W. Germantown Pike, Suite 110, Plymouth Meeting, Pennsylvania 19462. Inovio's common stock trades on the Nasdaq Capital Market ("Nasdaq") under the ticker symbol "INO."

### Defendant Shea

28.    Defendant Shea has served as the Company's CEO since May 2022 and as a Company director since 2022. Previously, Defendant Shea served as the Company's Chief Operating Officer ("COO") from 2019 to May 2022.

29.    During the Relevant Period, while the Company's stock was artificially inflated before the scheme was exposed, Defendant Shea made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| February 26, 2024 | 3,728 | $8.16 | $30,420 |
| May 10, 2024 | 2,392 | $10.65 | $25,475 |
| May 15, 2024 | 7,718 | $13.07 | $100,874 |
| February 26, 2025 | 11,581 | $1.98 | $22,930 |
| May 10, 2025 | 2,392 | $1.80 | $4,306 |
| May 15, 2025 | 7,717 | $1.95 | $15,048 |

Thus, in total, before the fraud was exposed, Defendant Shea sold 35,528 shares of Company common stock on inside information, for which she received approximately $199,054 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

30.     The Schedule 14A the Company filed with the SEC on April 7, 2025 (the "2025 Proxy Statement") stated the following about Defendant Shea:

> Dr. Shea has served as our Chief Executive Officer since May 2022 and previously served as our Chief Operating Officer from 2019 until her appointment as Chief Executive Officer. Prior to joining us, Dr. Shea served as Chief Executive Officer of Aeras, a nonprofit organization developing tuberculosis vaccines, from 2015 to 2018, and as its Chief Operating Officer from 2014 to 2015. Dr. Shea previously served as Vice President of Business Development, Europe for Emergent BioSolutions Inc. from 2013 to 2014, having previously served as Senior Director of Business Development for Emergent BioSolutions from 2005 to 2008. She was Vice President and General Manager of The Oxford-Emergent Tuberculosis Consortium, a global health joint venture formed between Oxford University and Emergent BioSolutions, from 2008 to 2013. She started her career as a post-doctoral researcher at Imperial College, London. Dr. Shea holds a Ph.D. from the National Institute for Medical Research, London, and a B.Sc. Hons. in Applied Biology from the University of Bath, U.K.

> Dr. Shea qualifies to serve on our Board given her broad scientific and biopharmaceutical industry experience and her experience as our Chief Executive Officer and previously as our Chief Operating Officer.

31.     Upon information and belief, Defendant Shea is a citizen of Pennsylvania.

**Defendant Kies**

32.     Defendant Kies has served as the Company's CFO since 2002.

33.     During the Relevant Period, while the Company's stock was artificially inflated before the scheme was exposed, Defendant Kies made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| February 26, 2024 | 3,466 | $8.16 | $28,283 |
| May 15, 2024 | 2,562 | $13.07 | $33,485 |
| February 26, 2025 | 5,322 | $1.98 | $10,538 |
| May 15, 2025 | 2,566 | $1.95 | $5,004 |

Thus, in total, before the fraud was exposed, Defendant Kies sold 13,916 shares of Company common stock on inside information, for which he received approximately $77,309 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

34.     The Company's website stated the following about Defendant Kies:[2]

As CFO, Mr. Kies' primary focus is assuring INOVIO's financial health as it reaches pipeline and commercialization goals in developing next-generation DNA medicines. As a key member of the executive leadership team, Mr. Kies is also responsible for developing and executing global financial strategy and action plans to meet the business objectives and to execute overall corporate strategy.

Prior to joining INOVIO in 2002, Mr. Kies acquired broad expertise in the functional and strategic management of biotechnology and high technology companies across the full spectrum of corporate growth, from IPO to profitability. He was previously Chief Financial Officer at Newgen Results Corporation and held positions at Cytel Corporation and Ernst & Young, LLP. He has more than 30 years of experience developing and working with biotechnology and high-tech companies.

Mr. Kies holds a B.S. degree in Business Administration from United States International University in San Diego, CA.

35.     Upon information and belief, Defendant Kies is a citizen of California.

**Defendant Benito**

---

[2] https://www.inovio.com/about-inovio/leadership/.

36.     Defendant Benito has served as the Chairman of the Board since January 3, 2019, and as a Company director since 2003. Defendant Benito currently serves as the Chair of the Nomination and Corporate Governance Committee, as a member of the Audit Committee, and as a member of the Compensation Committee.

37.     The 2025 Proxy Statement stated the following about Defendant Benito:

Prior to his retirement, Mr. Benito had a successful and extensive career serving several multinational corporations in senior executive positions, including 25 years at Merck & Company, Inc. His most recent positions included Senior Vice President, Merck Vaccine Division; Executive Vice President, Merck-Medco Managed Care; and Executive Director and Vice President, Merck Human Health, Japan. In addition, Mr. Benito was a Fellow of the Institute of Chartered Accountants in England and Wales for over 30 years until his retirement in 1999. From 2005 to 2022, Mr. Benito served as a director of DURECT Corporation, a publicly held specialty pharmaceutical company.

Mr. Benito qualifies to serve on our Board as he brings to our Board formal accounting and financial training and expertise, significant public company board experience, senior management experience in the health care industry, and important industry contacts.

38.     Upon information and belief, Defendant Benito is a citizen of New Jersey.

**Defendant Dansey**

39.     Defendant Dansey has served as a Company director since 2021. Defendant Dansey currently serves as a member of the Nomination and Corporate Governance Committee.

40.     The 2025 Proxy Statement stated the following about Defendant Dansey:

Dr. Dansey served as the Chief Development Officer and Chief Oncology Officer for Pfizer Oncology until his retirement in February 2025, following Pfizer's acquisition of Seagen, a global biotechnology company, in December 2023. He served as President, Research and Development at Seagen from November 2022 to December 2023 and was previously the Chief Medical Officer at Seagen starting in 2018. He also served as interim Chief Executive Officer of Seagen from May 2022 until November 2022. From 2015 to 2018, Dr. Dansey was Therapeutic Area Head for Late-Stage Oncology at Merck & Co., Inc., where he was responsible for registration efforts for Keytruda® (pembrolizumab) across multiple tumor types. Earlier in his career, Dr. Dansey was the Vice President of Oncology Clinical Research at Gilead Sciences and the Global Development Lead for Xgeva® (denosumab) at Amgen, where he held multiple roles in oncology and hematology.

Dr. Dansey currently serves on the board of directors of the publicly held company Kronos Bio, Inc. He holds an M.D. from the University of Witwatersrand in Johannesburg, South Africa.

Dr. Dansey qualifies to serve on our Board given his extensive experience in cancer drug development, deep oncology background, his clinical training and leadership experience.

41.     Upon information and belief, Defendant Dansey is a citizen of New York.

**Defendant Miller**

42.     Defendant Miller has served as a Company director since 2019. Defendant Miller previously served as a member of the Compensation Committee.

43.     The 2025 Proxy Statement stated the following about Defendant Miller:

Dr. Miller worked at Sanofi S.A. from 2012 until her retirement in 2018, serving as Vice President of Marketing and Vice President of Global Marketing, Oncology Division. From 2009 to 2011, Dr. Miller served as Senior Vice President at Eisai Co., Ltd. leading the Primary Care and Specialty Business unit and then Pharmaceutical Services. Dr. Miller previously served in management roles in global and U.S. marketing at Amgen, Inc. for five years and in positions of increasing responsibility at Merck & Co., Inc. over 16 years. Dr. Miller previously served on the boards of directors of the publicly held companies Allena Pharmaceuticals from October 2020 to January 2023 and Puma Biotechnology, Inc. from November 2019 to December 2021. Dr. Miller received an M.D. from the Duke University School of Medicine and a B.A. in chemistry, summa cum laude, from Duke University.

Dr. Miller qualifies to serve on our Board as a result of her years of commercial experience in the biopharmaceutical industry and her clinical training.

44.     Upon information and belief, Defendant Miller is a citizen of Maine.

**Defendant Shepard**

45.     Defendant Shepard has served as a Company director since 2020. Defendant Shepard currently serves as a member of the Audit Committee and as a member of the Nomination & Corporate Governance Committee.

46.     The 2025 Proxy Statement stated the following about Defendant Shepard:

Mr. Shepard currently serves as a Venture Partner with Catalys Pacific, a venture group focused on licensing drug programs and creating new companies in the United States and Japan. In this role, he is a co-founder and board member of two of its portfolio companies, Pathalys Pharma, Inc. and Aculys Pharma, Inc. Mr. Shepard previously was President and Chief Executive Officer of Aravive, Inc. (formerly Versartis, Inc.), a clinical-stage oncology company, from 2015 until his retirement in 2020. From 2013 to 2015, Mr. Shepard was Executive Chairman of Versartis. From 2008 until 2015, Mr. Shepard was an Executive Partner at Sofinnova Ventures, a venture capital firm focused on the healthcare industry. From 2010 to 2012, Mr. Shepard served as President and Chief Executive Officer and was a member of the board of directors of NextWave Pharmaceuticals, Inc., a specialty pediatric pharmaceutical company that was acquired by Pfizer. Between 2005 and 2008, Mr. Shepard served as interim President and Chief Executive Officer of the pharmaceutical companies Ilypsa, Inc. (acquired by Amgen) and Relypsa (Ilypsa, Inc.'s spin-out company, which was acquired by Galencia). Mr. Shepard was also vice president of commercial operations at Telik, Inc. and oncology business unit head of Alza Pharmaceuticals (acquired by Johnson & Johnson). He currently serves on the boards of directors of the publicly held companies Esperion Therapeutics, Inc. and Ironwood Pharmaceuticals, Inc. as well as chairman of the board of the Christopher and Dana Reeve Foundation. Mr. Shepard holds a B.S. in Business Administration from the University of Arizona.

Mr. Shepard qualifies to serve on our Board as a result of his years of healthcare and financial experience.

47.     Upon information and belief, Defendant Shepard is a citizen of Colorado.

**Defendant Weiner**

48.     Defendant Weiner has served as a Company director since 2016. According to the 2025 Proxy Statement, Defendant Weiner previously served as the Chairman of the Company's Scientific Advisory Board, for which he received over $120,000 from the Company during the year ended December 31, 2022.

49.     The 2025 Proxy Statement stated the following about Defendant Weiner:

Since 2016, Dr. Weiner has served as Executive Vice President and Director of the Vaccine Center at The Wistar Institute, the nation's first independent biomedical research institute, which is also an NCI-designated Cancer Center and an international leader in cancer, immunology and infectious disease research. Dr. Weiner is also the W. W. Smith Charitable Trust Professor of Cancer Research at The Wistar Institute. Previously, Dr. Weiner was Professor of Pathology & Laboratory Medicine at the University of Pennsylvania and Chair of the Gene Therapy and Vaccine Program at the University's Perelman School of Medicine.

He has more than 500 peer-reviewed publications in scientific journals, including mainstream scientific journals such as Scientific American, and has been designated by the Institute for Scientific Information as one of the top-cited scientists in the world. An inventor and holder of more than 100 issued and pending U.S. patents, Dr. Weiner has received numerous honors including election as a fellow to the American Association for the Advancement of Science in 2011 and the International Society for Vaccines in 2012. He was the recipient of the NIH Director's Transformative Research Award and received the Vaccine Industry Excellence Award for Best Academic Research Team in 2015 at the World Vaccine Congress. Dr. Weiner was honored with the prestigious Hilleman Lectureship in 2015 at the Children's Hospital of Philadelphia Grand Rounds session and received a Stone Family Award from Abramson Cancer Center for his groundbreaking work on DNA vaccines for cancer immune therapy. Dr. Weiner holds a Ph.D. in developmental biology from the University of Cincinnati College of Medicine, an M.S. in biology from the University of Cincinnati and a B.S. in biology from SUNY at Stony Brook in Stony Brook, New York.

Dr. Weiner qualifies to serve on our Board as he is a recognized leader in immunology as well as in gene vaccines and therapy.

50.    Upon information and belief, Defendant Weiner is a citizen of Pennsylvania.

**Defendant Yarno**

51.    Defendant Yarno has served as a Company director since 2017. Defendant Yarno currently serves as the Chair of the Compensation Committee and as a member of the Nomination and Corporate Governance Committee.

52.    The 2025 Proxy Statement stated the following about Defendant Yarno:

Ms. Yarno retired in 2008 from Merck & Company, Inc. following a 26-year career in commercial and human resource positions of increasing seniority, ending as Chief Marketing Officer. Ms. Yarno also spent part of her career at Johnson & Johnson, Inc. in commercial positions. Ms. Yarno currently serves on the boards of directors of the publicly held companies Ideaya Biosciences, Inc., Iovance Biotherapeutics, Inc. and Tarsus Pharmaceuticals, Inc. Within the last five years, Ms. Yarno served on the boards of directors of the publicly held companies Global Blood Therapeutics, Inc., MyoKardia, Inc., Alder Biopharmaceuticals, Inc. and Aratana Therapeutics, Inc. Ms. Yarno holds a B.S. in Business Administration from Portland State University and an M.B.A. from Temple University.

Ms. Yarno qualifies to serve on our Board as a result of her years of experience in the pharmaceutical industry.

53.     Upon information and belief, Defendant Yarno is a citizen of Arizona.

**Defendant Zoth**

54.     Defendant Zoth has served as a Company director since 2019. Defendant Zoth currently serves as the Chair of the Audit Committee and as a member of the Compensation Committee.

55.     The 2025 Proxy Statement stated the following about Defendant Zoth:

> Ms. Zoth currently serves on the boards of directors of the publicly held biopharmaceutical companies 89bio, Inc., and enGene Holdings, Inc. Within the last five years, she also served on the boards of directors of the public companies Lumos Pharma, Inc., Zymeworks, Inc., Spark Therapeutics, Inc., and Orexigen Therapeutics, Inc. (which was granted relief under Chapter 11 of the U.S. Bankruptcy Code in 2019). Prior to her board service, she served in senior financial roles in a variety of commercial-stage companies, including serving as MedImmune Inc.'s corporate controller from 2002 to 2004 and its chief financial officer from 2004 until its acquisition by AstraZeneca in 2007. Prior to joining MedImmune in 2002, Ms. Zoth served in financial executive roles at PSINet Inc., Sodexho Marriott Services, Inc., Marriott International and PepsiCo, Inc. Ms. Zoth also served as an auditor at Ernst & Young, LLP and is a Certified Public Accountant. Ms. Zoth holds a B.B.A. in accounting from Texas Tech University.

> Ms. Zoth qualifies to serve on our Board as a result of her years of experience in senior financial roles in a variety of commercial-stage companies over a 40-year career.

56.     Upon information and belief, Defendant Zoth is a citizen of Maryland.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

57.     By reason of their positions as officers, directors, and/or fiduciaries of Inovio and because of their ability to control the business and corporate affairs of Inovio, the Individual Defendants owed Inovio and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Inovio in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Inovio and its shareholders so as to benefit all shareholders equally.

58.     Each director and officer of the Company owes to Inovio and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

59.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Inovio, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

60.     To discharge their duties, the officers and directors of Inovio were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

61.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Inovio, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and directors of the Company, has been ratified by the remaining Individual Defendants, who collectively comprised a majority of Inovio's Board at all relevant times.

62.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of

inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

63.    To discharge their duties, the officers and directors of Inovio were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Inovio were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Pennsylvania, and the United States, and pursuant to Inovio's own Code of Business Conduct and Ethics (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Inovio conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Inovio and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Inovio's operations would comply with all applicable laws and Inovio's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

64.    Each of the Individual Defendants further owed to Inovio and the shareholders the duty of loyalty requiring that each favor Inovio's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

65.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Inovio and were at all times acting within the course and scope of such agency.

66.     Because of their advisory, executive, managerial, directorial, and controlling positions with Inovio, each of the Individual Defendants had access to adverse, non-public information about the Company.

67.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Inovio.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

68.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

69.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

70.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under

the authority of the Board, each of the Individual Defendants who is a director of Inovio was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

71.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

72.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Inovio and was at all times acting within the course and scope of such agency.

## INOVIO'S CODE OF ETHICS

73.     The Code of Ethics states that it "represents INOVIO's general corporate statement of ethical principles and high-level standards which guide INOVIO's operations in key areas." Moreover, the Code of Ethics states that it "applies to all officers, directors, and employees of INOVIO Pharmaceuticals, Inc. ("the Company") and its subsidiaries and affiliates."

74.     In a section titled "Administering Our Code," under the subsection "Comply with Laws, Rules, Regulations and Ethics," the Code of Ethics states the following, in relevant part:

> As a publicly traded U.S.-based company in a highly regulated industry that operates globally, the Company's conduct is subject to many laws, rules, and regulations.  The Company requires all employees – regardless of job, title, or function – to comply with all laws, rules, and regulations applicable to the Company wherever it does business.  Obeying the law, both in letter and in spirit, is the foundation on which the Company's ethical standards are built.
>
> In addition to strictly complying with all laws, rules, and regulations, you are also expected to know, understand, and comply with this Code.  This Code outlines the

company's position on the respective areas presented and serves as a roadmap for you to act in an ethical manner.  If you are ever uncertain about a course of conduct or encounter a potential issue, please be sure to review this Code, the relevant Employee Handbook for your location, and any department-specific procedures or guidances.

75.    In the same section, under the subsection "Report Any Illegal or Unethical Behavior," the Code of Ethics states the following, in relevant part:

Even the most ethical companies can experience concerns around unethical conduct. For our risk management program to work, employees must be able to raise questions and report suspected problems.  This reporting allows the Company to quickly provide guidance to navigate difficult situations and respond quickly to investigate suspected misconduct, and take decisive corrective actions to address the perceived problem.

76.    In the same section, under the subsection "Waivers of This Code of Business Conduct and Ethics," the Code of Ethics states the following:

Although some of the policies contained in this Code must be strictly adhered to and no exceptions can be allowed, exceptions may be possible in other cases.  Any amendment or waiver of this Code for executive officers, senior financial officers, or directors may be made only by the Board of Directors or a Board committee and will be disclosed promptly if required by applicable law or stock exchange regulation.  Any waivers for other personnel may be made by the Board of Directors or the Board of Directors may delegate authority from time to time to a committee or a designated officer.

77.    In a section titled "Integrity in the Marketplace," under the subsection "Regulatory Investigations," the Code of Ethics states the following:

As a company operating in a highly regulated industry, INOVIO is subject to routine auditing by various government agencies. In addition, at any time, INOVIO could be the subject of a regulatory investigation.  It is Company policy to cooperate fully with government agencies conducting investigations.  Immediately notify the Legal Department if you are contacted by any government authority with regard to a non-routine request for information or a facility visit.

78.    In a section titled "Ethics in Our Business Activities," under the subsection "Clinical Research," the Code of Ethics states the following:

INOVIO is working to reshape the future of treating and preventing cancer and infectious diseases.  To achieve our mission, the science we perform must rest on a solid foundation of integrity.  INOVIO is committed to conducting research and clinical studies in compliance with all applicable laws and regulations.  We protect the health and welfare of those individuals who participate in our research efforts and clinical trials.  We audit and monitor clinical study sites and processes related to our clinical trials.

Demonstrating its commitment to the quality and integrity of its clinical research, INOVIO has established a Clinical Compliance function, which (1) develops and approves an array of standard operating procedures (known as Controlled Clinical Documents) that align with Good Clinical Practices; (2) facilitates GCP training, knowledge checks, and responses to audits; and (3) scrupulously documents its work to put INOVIO in position to demonstrate compliance with regulatory requirements and be ready for inspection.

79.    In the same section, under the subsection "Safe and High Quality Manufacturing," the Code of Ethics states the following, in relevant part:

Our success and reputation depends on our ability to develop safe, high-quality drugs and devices.  Each employee must take ownership of our responsibility for protecting product quality and patient safety.  INOVIO is committed to creating the highest quality products and complying with all regulatory requirements and good manufacturing practices.  INOVIO's Quality Assurance team has implemented a Quality Management System and adopted a related Quality Manual to ensure that INOVIO provides safe and effective products that consistently meet or exceed quality, customer, and regulatory requirements.  We also require that our suppliers and business partners adhere to high standards.

80.    In a section titled "Responsibility to Our Company and Shareholders," under the subsection "Insider Trading," the Code of Ethics states the following:

As a U.S. public company, INOVIO and all its employees must comply with U.S. securities laws.  This includes prohibitions on "insider trading," which is the purchase or sale of a company's stock made with knowledge of nonpublic material information about the company.  "Material" information includes anything likely to influence a potential investor's decision to buy or sell stock.  Just as it is improper for you to financially benefit from inside information, it is also improper for your friends, family, or news sources to profit.  Trading on the basis of inside information is a criminal offense, and will result in immediate termination.

You must review and acknowledge receipt and review of INOVIO's Amended and Restated Insider Trading Policy as you are expected to abide by its terms.

81.     In the same section, under the subsection "Financial Reporting and Controls," the

Code of Ethics states the following, in relevant part:

> The Company requires honest and accurate recording and reporting of financial and
> other information in order to make responsible business decisions and full, fair,
> accurate, timely, and understandable financial and other disclosures to regulatory
> agencies and the public.  The Company will maintain internal controls to ensure
> that transactions are properly authorized, assets are safeguarded, operations are
> conducted in accordance with Board of Directors and management directives and
> financial records are reliable.  All of the Company's books, records, accounts, and
> financial statements must be maintained in reasonable detail, must appropriately
> reflect the Company's transactions, and must conform both to applicable legal
> requirements and to the Company's system of internal control.

> The Company will maintain disclosure controls to ensure that required information
> is recorded, processed, summarized, and reported as required by law and regulation
> and within the time periods specified.  Required information will be timely
> communicated to management as appropriate to allow timely decisions regarding
> disclosure.  Financial statements for external purposes will be fairly presented in
> conformity with generally accepted accounting principles accepted in the United
> States or other applicable standards as required by law or regulation.  Public
> statements and filings regarding the Company's business and financial status must
> be true, accurate, complete, timely, understandable, and not misleading.
> Unrecorded or "off the books" funds or assets will not be maintained unless
> permitted by applicable law or regulation.  No false or fictitious entries may be
> made on the Company books and records.

82.     In the same section, under the subsection "Conflicts of Interest," the Code of Ethics

states the following, in relevant part:

> A conflict of interest exists when the private interest of an employee interferes with
> that person's ability to advance the legitimate interests of the Company.  A conflict
> of interest can arise when you take actions or have interests that may make it
> difficult to perform your Company duties objectively and effectively.  Conflicts of
> interest may also arise when you, or members of your family, receive improper
> personal benefits as a result of your position with the Company.

83.     In the same section, under the subsection "Records Management," the Code of

Ethics states the following:

> Company records are important corporate assets. Records should always be
> retained or destroyed according to the applicable law and the Company's Records
> Retention Policy.  Records relevant to a pending or threatened government or

Company investigation or other legal action must not be destroyed. In the event of litigation or government investigation, you should consult the Company's Legal Department for instructions on document retention.

84.     In violation of the Code of Ethics, the Individual Defendants (as key officers and/or as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INOVIO'S AUDIT COMMITTEE CHARTER

85.     The Company also maintains an Audit Committee Charter. Under a section titled "Purpose," the Audit Committee Charter states the following about the Audit Committee's main purpose:

> The Audit Committee (the "Committee") of the Board of Directors (the "Board") of the Company is a standing committee and is responsible for oversight of all account reporting, financial and internal control practices of the Company and its subsidiaries. The Committee reports to the Board and its primary function is to assist the Board in fulfilling its responsibilities to shareholders related to (a) the oversight of (i) the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company; (ii) the integrity of the Company's financial statements; (iii) the effectiveness of the Company's internal control over financial reporting and (iv) the Company's compliance with legal and regulatory requirements; and (b) (i) the appointment, compensation, qualifications, independence and performance of the Company's independent auditors and (ii) the preparation of an audit committee report as required by the Securities and Exchange Commission (the "SEC"). The Committee's function is one of oversight only and shall not relieve the responsibilities of the Company's management for preparing financial statements, which accurately and fairly present the Company's financial results and condition and for establishing and maintaining internal control over financial reporting, or the responsibilities of the Company's independent registered public accounting firm (the "independent auditors") relating to the audit of the Company's financial statements and the effectiveness of internal control over

financial reporting, and for reviewing the Company's unaudited financial statements.

The Committee has the authority to retain persons having special competence as necessary to assist the Committee in fulfilling its responsibilities.

The Committee shall review and reassess, at least annually, the adequacy of this charter and recommend to the Board any improvements to this charter that the Committee considers necessary.

86.     In a section titled "Authority and Responsibilities," under the subsection "Financial Statement and Disclosure Matters," the Audit Committee Charter states that the Audit Committee will:

(a)     Meet to review and discuss with management and the independent auditors the annual audited financial statements and quarterly financial statements prior to the filing of such financial statements with the SEC, including reviewing the specific disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations, and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K.  Also, the Committee shall discuss the results of the quarterly reviews and approve the Company's Quarterly Reports on Form 10-Q.  The Committee shall also discuss any other matters required to be communicated to the Committee by the independent registered public accountants under the standards of the Public Company Accounting Oversight Board (PCAOB) (United States).

(b)     [d]iscuss with management and the independent auditors any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements and any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps audit adopted or which need to be adopted in light of material control deficiencies.

(c)     Effect or cause to be effected any revisions to the Company's financial statements which the Committee deems necessary or advisable after consultation with the Company's independent auditors or the Committee's advisors."

(d)     Prior to the filing of Form 10-Q and Form 10-K, review and discuss quarterly and annual reports from the independent auditors on:

(i) All critical accounting policies and practices to be used, including discussion with the independent auditors any accounting adjustments that

were noted or proposed by the Auditors but were "passed" (as immaterial or otherwise).

(ii) All alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors.

(iii) Other material written communications between the independent auditors and management such as any management letter or schedule or unadjusted differences.

(e)      Discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies.  Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

* * *

(h)      Review and discuss annually with management its assessment of the effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures under Section 404 of the Sarbanes-Oxley Act of 2002 and the rules and regulations thereunder, including:

(i) Review annually with the independent auditors their opinion and report on the effectiveness of the Company's internal control over financial reporting; and

(ii) Consider whether any changes to the internal control over financial reporting or disclosure controls and procedures are appropriate in light of management's assessment or the independent auditors' report.

(i)      Review disclosures made to the Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls. Discuss with management the related remediation plan of any significant deficiencies or material weaknesses.

* * *

(l)      Meet separately and periodically with management of the Company, the employees of the Company responsible for the internal audit and the Company's independent auditors.

\* \* \*

(n)     Discuss with management, the internal auditors, and the independent registered public accountants any (1) changes in internal control over financial reporting that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting that are required to be disclosed and (2) any other changes in internal control over financial reporting that were considered for disclosure in the Company's period filings with the SEC.

(o)     Inquire of financial management and the independent auditors regarding the Company's significant financial risk exposures, including its anti-fraud programs and controls, and assess the steps management has taken to minimize and control such risks.

87.     In the same section, under the subsection "Compliance Oversight Responsibilities,"

the Audit Committee Charter states that that the Audit Committee will:

(a)     Obtain from the independent auditors assurance that Section 10A(b) of the Exchange Act, which addresses the discovery and disclosure of any illegal act, has not been implicated.

(b)     Obtain reports from management, the Company's senior internal auditing executive and the independent auditors that such persons are in compliance with applicable legal requirements and the Company's Code of Business Conduct and Ethics.  Such reports shall also confirm that, to such person's knowledge, the Company and its subsidiary and affiliated entities are in conformity with applicable legal requirements and the Company's Code of Business Conduct and Ethics. Review reports and disclosures of insider and affiliated party transactions or other conflicts of interest.  Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Business Conduct and Ethics, including the consideration of a waiver in the Code of Business Conduct and Ethics.

(c)     Establish, review, and, as necessary, update procedures for the receipt, retention and treatment of complaints received by the Company from employees of the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of or advisors to the Company of concerns regarding questionable accounting or auditing matters (i.e., the Company's whistleblower program).

(d)     Discuss with management and the independent auditors any correspondence with regulators or governmental agencies and any published reports, which raise material issues regarding the Company's financial statements or accounting policies."

(e)    Discuss quarterly in separate sessions with the Company's General Counsel and outside counsel legal matters that may have a material impact on the financial statements, or the Company's compliance policies.

(f)    Evaluate complaints received by the Company from employees of the Company regarding accounting, internal accounting controls or auditing matters, and any confidential, anonymous submissions by employees of or advisors to the Company of concerns regarding questionable accounting or auditing matters, and where deemed necessary and appropriate, initiate investigation into such matters, either by the Committee, via formation of a special committee, via recommendation to the Board of Directors for formation of a special committee, or through the engagement of a third party to conduct an independent investigation.

(g)    The Committee will receive, review and discuss with the Company's General Counsel attorneys' reports of evidence of material violations of securities laws and breaches of fiduciary duty and similar violations of U.S., state or other applicable law.

88.    In violation of the Audit Committee Charter, the Individual Defendants failed to adequately review and discuss the Company's annual and quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Background on Inovio*

89.    Inovio is a clinical-stage biotechnology company incorporated in Delaware and headquartered in Plymouth Meeting, Pennsylvania. The Company's business operations surround the creation and marketing of DNA medicines, namely for the treatment of HPV-associated diseases, cancer and infectious diseases.

90.    The Company's products fall into two categories: DNA plasmids and CELLECTRA® devices. DNA plasmids are circular molecules of DNA which can carry and

transmit genetic information to a patient's cells. The patient's cells are able to use this genetic information to generate a sufficient immune response for the disease at issue.

91.    The Company's CELLECTRA® devices refer to a proprietary technology of the Company which transfer DNA plasmids into the patient's body. Notably, the Company's CELLECTRA® devices avoid the use of lipid nanoparticles, viral vectors, or chemical adjuvants.

92.    The Company's lead product candidate, INO-3107, is intended to treat RRP. RRP is a rare, chronic, and severe disease caused by HPV-6 and HPV-11. RRP's symptoms generally include the recurring growth of wart-like growths in the respiratory tract known as papillomas. In some cases, RRP papillomas can obstruct airways and cause life-threatening respiratory complications.

93.    Currently, the standard treatment for RRP is multiple invasive surgeries. Notably, RRP patients have repeatedly provided feedback that the reduction in the number of surgeries required would be monumental to their well-being. According to the most recent data, there are an estimated 14,000 active cases across adult and juvenile patients, with roughly 1.8 new cases per 100,000 adults each year.

94.    INO-3107, according to the Company, has the potential to help patients treat RRP. The chronic nature of RRP derives from the fact that patients are generally incapable of inducing an effective immune response to HPV-6 and HPV-11 on their own. As such, INO-3107 purportedly enables a patient's body to create new T-cells that can target HPV-6 and HPV-11 infected cells. T-cells are a form of white blood cell that fight and kill off infected or cancerous cells.

***The Biologics License Application***

95.     A BLA is a standard application promulgated and reviewed by the FDA for any entity which seeks to introduce a biological product into interstate commerce within the United States. A BLA includes the following requirements: (1) applicant information; (2) product/manufacturing information; (3) pre-clinical studies; and (4) labeling.

96.     A BLA also features an "Accelerated Approval" program. The main purpose of the Accelerated Approval program is to allow drugs intended to treat serious conditions and which meet unmet medical demand to receive approval based on a surrogate endpoint. Surrogate endpoints in the BLA context refer to markers, typically laboratory measurements, physical signs, or other measures that are considered to predict clinical benefit but does not actually measure clinical benefit.

97.     Throughout the Relevant Period, the Individual Defendants highlighted that it was likely INO-3107's BLA would be granted accelerated approval by the FDA.

**False and Misleading Statements**

***October 10, 2023 Press Release***

98.     The Relevant Period began on October 10, 2023, before the market opened, when the Company issued a press release pertaining to the INO-3107 BLA's purported prospects for accelerated approval (the "October 2023 INO-3107 Press Release").

99.     More specifically, the October 2023 INO-3107 Press Release stated the following, in relevant part:

> INOVIO . . . has received feedback from the [FDA] that data from its completed Phase 1/2 trial of INO-3107 for the treatment of RRP could support INOVIO's submission of a BLA for review under the FDA's accelerated approval program. The FDA also advised that the company's previously planned Phase 3 randomized, placebo-controlled trial would not be required to support this submission. INOVIO will be required to initiate a confirmatory trial prior to BLA submission for accelerated approval and satisfy all other FDA filing requirements . . . . If approved, INO-3107 would be the first DNA medicine in the United States and the first INOVIO candidate to receive regulatory approval.

100.    The October 2023 INO-3107 Press Release also quoted Defendant Shea as highlighting the Company's "focus[] on streamlining our development plan to support submission of a BLA for accelerated approval."

***November 9, 2023 Press Release and Form 10-Q***

101.    On November 9, 2023, the Company issued a press release to announce its financial results for the third quarter of 2023 (the "Q3 2023 Press Release").

102.    The Q3 2023 Press Release noted that the Company had "*[r]eceived FDA feedback that data from [a] completed Phase 1/2 trial could be used to submit a [BLA] under [the] Accelerated Approval program*" and was "*[a]ccelerating [its] commercialization strategy in preparation for an earlier launch*" (emphasis in original).

103.    The Q3 2023 Press Release also reported the following, in relevant part:

The FDA advised that completion of a Phase 3 trial would not be required to support th[e BLA] submission. INOVIO will be required to initiate a confirmatory trial prior to BLA submission for accelerated approval and satisfy all other FDA filing requirements. Subsequent to this feedback, INOVIO has been focused on preparing to file its BLA under the accelerated approval program. The company anticipates additional meetings with the FDA to finalize next steps, including an Initial Comprehensive Multidisciplinary Breakthrough Therapy Meeting, or Type B meeting, which it has requested to be held in the fourth quarter of 2023. INOVIO plans to pursue other benefits offered by Breakthrough Therapy designation to quickly resolve any future questions, as well as take advantage of the opportunity to submit under the FDA's Rolling Review program and request a Priority Review once the BLA is fully submitted.

104.    Moreover, the Q3 2023 Press Release quoted Defendant Shea as stating the following, in relevant part:

Following Breakthrough Therapy designation from the FDA in September and subsequent feedback that we no longer need to complete a Phase 3 trial prior to submitting a BLA under the accelerated approval program, our team is laser-focused on next steps. These steps include holding an Initial Comprehensive Multidisciplinary Breakthrough Therapy Meeting with the FDA in the near future to confirm alignment on our accelerated development plans and to clarify timing

associated with potentially making INO-3107 available to patients suffering from this devastating disease.

105.    Also on November 9, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter of 2023, signed by Defendants Shea and Kies (the "Q3 2023 10-Q"). Attached to the Q3 2023 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Shea and Kies, certifying that the Q3 2023 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that the "information contained in the [Q3 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

106.    The Q3 2023 10-Q stated that "data from our completed Phase 1/2 clinical trial of INO-3107 for the treatment of RRP can be used to support the submission of a . . . BLA[] for review under the FDA's accelerated approval program[,]" and that "[t]he FDA also advised that we will no longer be required to conduct our previously planned Phase 3 randomized, placebo-controlled trial[.]"

107.    The Q3 2023 10-Q also contained supposed risk warnings that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "if" certain conditions occurred. At the same time, the Q3 2023 10-Q minimized such risks, stating the following, in relevant part:

*We plan to pursue accelerated approval for our product candidate INO-3107[.]*

\* \* \*

*If we pursue accelerated approval for INO-3107 for the treatment or [sic] RRP . . . we would do so on the basis that there is no available therapy for that disease or condition or that our product candidate provides a benefit over available*

*therapy. If* standard of care were to evolve or *if* any of our competitors were to receive full approval on the basis of a confirmatory trial for a drug or biologic for a disease or condition for which we are seeking accelerated approval before we receive accelerated approval, the disease or condition would no longer qualify as one for which there is no available therapy, and accelerated approval of our product candidate would not occur without a showing of benefit over available therapy. The treatment landscape can change quickly as the FDA converts accelerated approvals to full approvals on the basis of successful confirmatory trials.

*We have received feedback from the FDA that data from our completed Phase 1/2 clinical trial of INO-3107 for the treatment of RRP can be used to support the submission of a BLA for review under the accelerated approval program*; however, whether any trial is sufficient to receive FDA approval under the accelerated approval pathway will depend on the safety and efficacy results of such trial and will only be determined by the FDA upon review of a submitted BLA.

* * *

In addition, the FDA *may* terminate the accelerated approval program or change the standards under which accelerated approvals are considered and granted in response to public pressure or other concerns regarding the accelerated approval program. Changes to or termination of the accelerated approval program *could* prevent or limit our ability to obtain accelerated approval of any of our clinical development programs.

### January 3, 2024 Press Release

108.    On January 3, 2024, the Company issued the January 2024 INO-3107 Press Release. The January 2024 INO-3107 Press Release announced Inovio's "plans to submit a BLA for INO-3107 as a potential treatment for [RRP] *in the second half of 2024[,]*" "*follow[ing] an Initial Comprehensive Multidisciplinary Breakthrough Therapy (Type B) Meeting with the FDA on critical aspects of the data package required to submit a BLA under the agency's accelerated approval program*."

109.    The January 2024 INO-3107 Press Release also quoted Defendant Shea as emphasizing that, "*[b]ased on productive discussions with the FDA, we believe we now have established a path to submitting a BLA for INO-3107 under the accelerated approval program*,"

and that "*[o]ur plan is to complete the submission of our BLA in the second half of 2024 and* request a Priority Review."

### March 6, 2024 Press Release and Form 10-K

110.    On March 6, 2024, the Company issued a press release to announce its financial results for the fourth quarter and full year of 2023 (the "Q4 2023 Press Release"). The Q4 2023 Press Release quoted Defendant Shea as stating the following, in relevant part:

> In the past year we have taken our lead candidate, INO-3107 for RRP, from positive Phase 1/2 trial results to Breakthrough Therapy designation and *an established path to BLA submission under the FDA's accelerated approval program* . . . . The year ahead will provide a critical opportunity to carry this positive momentum forward across our pipeline, particularly for INO3107 as we prepare for BLA submission and the initiation of a confirmatory trial in *the second half of 2024* and accelerate commercialization efforts for *a potential 2025 launch*.

111.    Also on March 6, 2024, the Company filed a Current Report on Form 10-K with the SEC the fourth quarter of and year ended December 31, 2023 (the "2023 10-K"). The 2023 10-K was signed by Defendants Shea, Kies, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth. Attached to the 2023 10-K were SOX certifications signed by Defendants Shea and Kies certifying that that 2023 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that the "information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

112.    The 2023 10-K underlined the quality and reliability of the Company's CELLECTRA® devices, reporting, *inter alia*, that the "devices have been designed to optimize delivery of our DNA medicine candidates depending on the target disease" and "*are validated and manufactured under Current Good Manufacturing Practices* (cGMP)."

113.    Regarding the Company's manufacturing efforts and commercialization, the 2023 10-K stated the following, in relevant part:

> In 2023, we began accelerating the development of our commercialization plans for INO-3107 in the United States following notice from the FDA that the data from our completed Phase 1/2 trial in patients with RRP could be used to submit a BLA under the accelerated approval program.
>
> We believe our plasmids can be produced in commercial quantities through uniform methods of fermentation and processing that are applicable to all plasmids. We believe we will be able to obtain sufficient supplies of plasmids for all foreseeable clinical investigations.

114.    The 2023 10-K also contained the same boilerplate provisions pertaining to risk warnings as noted in the Q3 2023 10-Q. *Supra* ¶ 107.

115.    The statements referenced above in ¶¶ 98-114 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company failed to maintain internal controls; (2) as a result, the Company lacked sufficient research to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (3) the INO-3107 BLA would be unlikely to receive accelerated approval or priority review from the FDA; (4) INO-3107's financial prospects were greatly exaggerated; and (5) as a result, the Company's overall financial assertions were inaccurate. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

### *April 11, 2024 Proxy Statement*

116.    On April 11, 2024, the Company filed a proxy statement on Schedule 14A with the SEC (the "2024 Proxy Statement"). Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner,

Yarno, and Zoth solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

117.    The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth to the Board; (2) ratify the appointment of Ernst & Young as the Company's independent registered public accounting firm for the year ended December 31, 2024; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

118.    Regarding the "Board['s] Role in Risk Management," the 2024 Proxy Statement, stated the following:

> The risk oversight function of our Board is carried out by both the Board and the Audit Committee. Management prepares and presents an annual business plan to the Board, which identifies risks associated with our operations and is reviewed quarterly by the Board. As provided in its charter, the Audit Committee meets periodically with management to discuss major financial and operating risk exposures and the steps, guidelines and policies taken or implemented related to risk assessment and risk management. Matters of strategic risk are considered by our Board. Each quarter management reports to the Audit Committee on legal, finance, accounting and tax matters. Our Board is provided with reports on legal matters at least quarterly and on other matters related to risk oversight on an as needed basis.

119.    Regarding the Company's Code of Ethics, the 2024 Proxy Statement provided:

> We have adopted a Code of Business Conduct and Ethics, which applies to all directors, officers and employees, including the principal executive officer, principal financial and accounting officer and controller. The purpose of the Code is to promote honest and ethical conduct. The Code of Business Conduct and Ethics is available on our website and is also available in print, without charge, upon written request to our corporate secretary at 660 W. Germantown Pike, Suite 110, Plymouth Meeting, Pennsylvania 19462. Any amendments to or waivers of the Code will be promptly posted on our website at www.inovio.com or in a report on Form 8-K, as required by applicable laws.

120.    Regarding the Company's Audit Committee, the 2024 Proxy Statement notes its responsibilities, in relevant part, as:

The functions of the Audit Committee include retaining our independent registered public accounting firm, reviewing its independence, reviewing and approving the planned scope of our annual audit, reviewing and approving any fee arrangements with our independent registered public accounting firm, overseeing its audit work, reviewing and pre-approving any non-audit services that may be performed by it, reviewing the adequacy of accounting and financial controls, reviewing our critical accounting policies and reviewing and approving any related party transactions. The Audit Committee acts pursuant to a written charter that is available on our corporate website at: http://www.inovio.com.

121.    Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia:* (1) the Company failed to maintain internal controls; (2) as a result, the Company lacked sufficient research to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (3) the INO-3107 BLA would be unlikely to receive accelerated approval or priority review from the FDA; (4) INO-3107's financial prospects were greatly exaggerated; and (5) as a result, the Company's overall financial assertions were inaccurate. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

122.    The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

123.    As a result of Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno,

and Zoth to the Board; (2) ratify the appointment of Ernst & Young as the Company's independent registered public accounting firm for the year ended December 31, 2024; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

### May 13, 2024 Press Release and Form 10-Q

124.    On May 13, 2024, the Company issued a press release to announce its financial results for the first quarter of 2024 (the "Q1 2024 Press Release").

125.    Regarding the INO-3107 BLA and the Company's plans to manufacture INO-3107, the Q1 2024 Press Release stated the following, in relevant part:

> **INOVIO remains on target to submit its BLA seeking accelerated approval for INO-3107 in the second half of 2024.** INOVIO is preparing trial sites for recruitment based on recent feedback from the FDA that they had no additional comments on INOVIO's proposed design for the confirmatory trial. The trial is being strategically designed to focus on evaluating clinical benefit in reducing surgical intervention to control RRP disease for the majority of RRP patients. Repeat surgical interventions is the current standard of care for RRP. INOVIO's market research to date with patients and healthcare professionals indicates that a reduction of even one surgery matters, because every surgery poses a significant risk of causing permanent damage to the vocal cords.

* * *

> **INOVIO continues preparations to be ready to launch commercially in 2025**, should INO-3107 be approved. Efforts are focused on building the infrastructure needed to deliver the product to patients as quickly and easily as possible, from distribution and supply efforts to payer and healthcare provider support. INOVIO believes that **INO-3107, if approved, has the potential to be the preferred treatment of choice for all patients with RRP, as well as healthcare professionals and payers based on results from completed clinical trials and the competitive strengths of the DNA medicine platform[.]**

126.    The Q1 2024 Press Release also quoted Defendant Shea as stating the following, in relevant part:

> In the first quarter of 2024, we continued to deliver on our priorities for the year. **Of utmost importance, we remain on track to submit our BLA in the second half of 2024 under the accelerated approval pathway for INO-3107 as a treatment for RRP** and are working to initiate our confirmatory trial as soon as possible based on

feedback from the FDA on the trial's design. We are energized by the opportunity to potentially deliver the first FDA-approved therapy for this devastating disease and continue to work expeditiously to be prepared to serve RRP patients and the physicians caring for them. If approved, INO-3107 would also be the first DNA medicine on the market in the United States, representing a major milestone for our technology platform[.]

127.    Also on May 13, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the first quarter of 2024, signed by Defendants Shea and Kies (the "Q1 2024 10-Q"). Attached to the Q1 2024 10-Q were SOX certifications signed by Defendants Shea and Kies, certifying that the Q1 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that the "information contained in the [Q1 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

128.    The Q1 2024 10-Q stated, *inter alia*, that "[w]e have received feedback from the FDA that data from our completed Phase 1/2 clinical trial of INO-3107 for the treatment of RRP can be used to support the submission of a BLA for review under the accelerated approval program[,]" and that "[a]s part of submitting our BLA under the accelerated program, ***which we plan to do in the second half of 2024***, we will need to satisfy all FDA filing requirements and initiate a confirmatory clinical trial prior to BLA submission."

129.    The Q1 2024 10-Q also contained the same boilerplate provisions pertaining to risk warnings as noted in the Q3 2023 10-Q. *Supra* ¶ 107.

130.    The statements referenced above in ¶¶ 124-129 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company failed to maintain internal controls; (2) as a result, the Company lacked sufficient

research to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (3) the INO-3107 BLA would be unlikely to receive accelerated approval or priority review the FDA; (4) INO-3107's financial prospects were greatly exaggerated; and (5) as a result, the Company's overall financial assertions were inaccurate. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

### THE TRUTH BEGINS TO EMERGE AS THE FALSE AND MISLEADING STATEMENTS CONTINUE

***August 8, 2024 Press Release, Earnings Call, and Form 10-Q***

131.    The truth began to emerge on August 8, 2024, after the market closed, when the Company issued Q2 2024 Press Release. The Q2 2024 Press Release reported that the expected submission date for the INO-3107 BLA to the FDA would be in mid-***2025***. This expectation amounted to approximately a full-year delay from the initial expected submission date of mid-2024.

132.    The Q2 2024 Press Release cited "a manufacturing issue" with a component of the CELLECTRA® device, and quoted Defendant Shea as stating the following, in relevant part:

> We continue to make progress with our lead candidate, INO-3107, which has the potential to significantly improve the lives of patients with RRP. ***We expect all non-device related elements of our BLA package to be completed by year end*** and our pre-BLA meeting last week with the FDA provided us with confidence that we remain on the right track for the regulatory submission. However, as part of the testing process required for BLA submission, ***we've recently identified a manufacturing issue with the single use disposable administration component of our device that we believe is resolvable, but will take additional time to rectify*** . . . . ***We're taking corrective steps to address the issue***, ***and . . . we now expect to be able to submit the BLA in mid-2025.***

133.    That same day, after the market closed, the Company hosted Q2 2024 Earnings Call. During the Q2 2024 Earnings Call, the Company's CMO, Michael Sumner, discussed the

manufacturing issue with the CELLECTRA® device noted in the Q2 2024 Press Release. Mr. Sumner stated the following, in relevant part:

> [W]e have unfortunately run into a manufacturing issue with a component of our CELLECTRA device. The single-use disposable administration component, otherwise known as the array. This is used to inject the DNA medicine and administer the electroporation. The issue stems from one of the plastic molded parts within this array and was identified during routine testing to support our BLA filing.
>
> * * *
>
> Our device teams with the support of our external component manufacturers are working to rapidly address the issue and then repeat the required testing for the array. The additional time needed for completing this work and testing has extended our anticipated timeline for BLA submission to mid-2025.

134.    Market analysts took swift notice of the Company's disclosures, with at least two analysts reducing their price targets for the Company's stock.

135.    On this news, the price per share of the Company's common stock fell $0.27, or approximately 3.1%, from a price per share of $8.71 at the close of trading on August 8, 2024, to close at $8.44 per share at the close of trading on August 9, 2024. However, the Individual Defendants continued to make false and misleading statements to investors regarding the true nature of the INO-3107 BLA.

136.    For instance, also on August 8, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the second quarter of 2024 (the "Q2 2024 10-Q"). The Q2 2024 10-Q was signed by Defendants Shea and Kies. Attached to the Q2 2024 10-Q were SOX certifications signed by Defendants Shea and Kies, certifying that the Q2 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that the "information contained in the [Q2 2024

10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

137.    The Q2 2024 10-Q also contained the same boilerplate provisions pertaining to risk warnings as noted in the Q3 2023 10-Q. *Supra* ¶ 107.

### *November 14, 2024 Press Release and Form 10-Q*

138.    On November 14, 2024, the Company issued a press release to announce its financial results for the third quarter of 2024 (the "Q3 2024 Press Release").

139.    The Q3 2024 Press Release quoted Defendant Shea as emphasizing INO-3107's ability to improve the effectiveness of current RRP treatments and satisfy unmet demand. More specifically, the Q3 2024 Press Release quoted Defendant Shea as stating the following, in relevant part:

> Our development of INO-3107 is supported by a growing body of research that collectively points to INO-3107's potential to be an important therapeutic option for all RRP patients regardless of the severity of their disease. We recently presented new immunology data highlighting the ability of INO-3107 to induce new populations of T cells that travel to the airway tissue and papilloma and correspond with clinical benefit. We've also presented our full safety and efficacy data, demonstrating that INO-3107 was shown to be well tolerated and have clinical benefit in the Phase 1/2 trial. Additionally, by the end of year, we anticipate announcing long-term clinical durability data. We continue to believe INO-3107 has the potential to become the preferred choice for the broadest number of RRP patients, healthcare providers and payors, if approved.

140.    Also on November 14, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter of 2024, signed by Defendants Shea and Kies (the "Q3 2024 10-Q"). Attached to the Q3 2024 10-Q were SOX certifications signed by Defendants Shea and Kies, certifying that the Q3 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"

and that the "information contained in the [Q3 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

141.    The Q3 2024 10-Q also contained the same boilerplate provisions pertaining to risk warnings as noted in the Q3 2023 10-Q. *Supra* ¶ 107.

***January 9, 2025 Press Release***

142.    On January 9, 2025, the Company issued a press release to announce its key accomplishments from 2024 and anticipated milestones for 2025 (the "January 2025 Press Release"). The January 2025 Press Release "highlight[ed] anticipated milestones for 2025 and key accomplishments from 2024 in advance of upcoming investor meetings."

143.    The January 2025 Press Release further emphasized the Company's readiness pertaining to its submission of the INO-3107 BLA to the FDA, stating the following, in relevant part:

**INO-3107**

Anticipated Milestones for 2025

• Submit BLA to the [FDA] by mid-2025 and request priority review. INO-3107 could be the preferred non-surgical therapeutic option for [RRP] and would be the first DNA medicine approved for any indication in the United States, should it be approved.
    • Resolution of previously announced single-use array manufacturing issue expected by February 2025. Next steps following resolution include completion of retesting process for the CELLECTRA® device and finalization of the device sections of the Chemistry, Manufacturing and Controls (CMC) module, which will be used to update the active Investigational New Drug (IND) Application for the confirmatory trial as well as the BLA submission.

* * *

• Submit a redosing study protocol to the FDA.
    • Recently announced durability data support rationale for redosing patients with goal to maintain or improve clinical benefit.

• Present and publish recently announced durability data and immunology data,

as well as the full efficacy and tolerability data from completed Phase 1/2
clinical trial, in a peer-reviewed scientific journal.

(Emphasis in original).

***February 12, 2025 Press Release***

144.    On February 12, 2025, the Company issued a press release to report data from its

Phase 1/2 clinical trial of INO-3107 (the "February 2025 INO-3107 Press Release"). The data set

forth in the February 2025 INO-3107 Press Release supposedly reinforced the strengths of INO-

3107 regarding the improvement of current RRP treatments and satisfaction of unmet medical

demand, stating the following, in relevant part:

> In the trial, treatment with INO-3107 induced new populations of T cells in the
> blood that traveled to the airway and papilloma tissue and were correlated with a
> reduction in the number of post-treatment surgeries. Of the 32 patients in the trial,
> 26 patients (81%) required fewer surgeries post-treatment when compared to the
> year prior to treatment. INO-3107 treatment was also well tolerated in the trial.
> INOVIO plans to submit its [BLA] for INO-3107 in mid-2025 and request rolling
> submission and priority review under the FDA's accelerated approval program. If
> approved, INO-3107 would be the first DNA medicine approved for any indication
> in the United States.

145.    The February 2025 INO-3107 Press Release also quoted Defendant Shea as stating

the following:

> These important data characterizing the cytotoxic T cell-based mechanism of action
> of INO-3107, in conjunction with our recently reported durability data showing that
> clinical benefit continued to improve through year two and into year three after
> initial treatment, with half of patients not requiring any surgeries in year two, are
> ***part of the growing body of evidence that INO-3107 has the potential to be the
> preferred product of choice for both patients and healthcare providers*** . . . . The
> primary goal for RRP patients is to reduce or eliminate the need for surgery and
> INO-3107 has the potential to do just that for the majority of patients. Every surgery
> matters and a safe and effective therapeutic alternative to surgery would be truly
> life-changing for RRP patients and their caregivers.

***March 18, 2025 Press Release and Form 10-K***

146.     On March 18, 2025, the Company issued the Q4 2024 Press Release. The Q4 2024

Press Release quoted Defendant Shea as stating the following, in relevant part:

> INOVIO's recent progress puts us on the cusp of achieving several long-term goals
> for our DNA medicines, most importantly the submission of our first BLA and
> potential transition to a commercial-stage company . . . . By resolving the
> previously announced device array component issue, we are back on track to
> submitting our first BLA for INO-3107 to the FDA. We anticipate starting our
> submission in mid-2025 with non-device related modules under the agency's
> rolling submission program, assuming it is granted, with the goal of having the
> complete submission accepted for priority review before the end of the year. ***We
> continue to believe that INO-3107 has the potential to be the preferred product
> candidate offering durable clinical benefit, tolerability and a patient-centric
> dosing regimen and are moving forward with urgency.***

147.     On March 18, 2025, the Company filed its Annual Report on Form 10-K with the

SEC for the fourth quarter and full year ended December 31, 2024 (the "2024 10-K"). The 2024

10-K was signed by Defendants Shea, Kies, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and

Zoth. Attached to the 2024 10-K were SOX certifications signed by Defendants Shea and Kies

certifying that that 2024 10-K "does not contain any untrue statement of a material fact or omit to

state a material fact necessary to make the statements made, in light of the circumstances under

which such statements were made, not misleading with respect to the period covered by this report"

and that the "information contained in the [Q3 2024 10-Q] fairly presents, in all material respects,

the financial condition and results of operations of the Company."

148.     The 2024 10-K stated, *inter alia*, that "[i]n 2024, we continued to advance the

development of our commercialization plans for INO-3107 in the United States based on the

notification from the FDA that the data from our completed Phase 1/2 trial (RRP-001) could be

used to submit a BLA under the FDA's accelerated approval program[,]" and that "[w]e resolved

the manufacturing issue in the first quarter of 2025 and are currently on track to begin a rolling

submission of the BLA in mid-2025 and to request priority review[.]"

149.    The Q3 2024 10-Q also contained the same boilerplate provisions pertaining to risk warnings as noted in the Q3 2023 10-Q. *Supra* ¶ 107.

150.    The statements referenced above in ¶¶ 136-149 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company failed to maintain internal controls; (2) as a result, the Company lacked sufficient research to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (3) the INO-3107 BLA would be unlikely to receive accelerated approval or priority review from the FDA; (4) INO-3107's financial prospects were greatly exaggerated; and (5) as a result, the Company's overall financial assertions were inaccurate. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

### *April 7, 2025 Proxy Statement*

151.    On April 7, 2025, the Company filed the 2025 Proxy Statement. Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

152.    The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth to the Board; (2) ratify the appointment of Ernst & Young as the Company's independent registered public accounting firm for the year ended December 31, 2025; (3) approve, on an advisory basis, the compensation of the Company's named executive officers; and (4) approve an amendment and

restatement to the Company's 2023 Omnibus Incentive Plan (the "2025 Amendment of the 2023 Omnibus Incentive Plan").

153.    The 2025 Proxy Statements states that the 2025 Amendment of the 2023 Omnibus Incentive Plan would, *inter alia*: increase the aggregate number of shares of common stock available for grant by 2,200,000 shares and extend the term during which incentive stock options may be granted under the 2025 Amendment of the 2023 Omnibus Incentive Plan to February 27, 2035. The 2025 Proxy Statement states that, as of March 24, 2025, 24,460 shares of common stock were still available for grant, meaning that if the 2025 Amendment of the 2023 Omnibus Incentive Plan is approved, the Company will have approximately 2,224,460 shares available for grant. The 2025 Proxy Statement identifies that "[a]ll of our (including our affiliates') employees, non-employee directors and consultants are eligible to participate" in the 2025 Amendment to the 2023 Omnibus Incentive Plan. The 2025 Proxy Statement states that if the 2025 Amendment of the 2023 Omnibus Incentive Plan is not approved, the Company's incentive plan would continue to be administered in its current form.

154.    Regarding the "Board['s] Role in Risk Management[,]" the 2025 Proxy Statement stated the following:

> The risk oversight function of our Board is carried out by both the Board and the Audit Committee. Management prepares and presents an annual business plan to the Board, which identifies risks associated with our operations and is reviewed quarterly by the Board. As provided in its charter, the Audit Committee meets periodically with management to discuss major financial and operating risk exposures and the steps, guidelines and policies taken or implemented related to risk assessment and risk management. Matters of strategic risk are considered by our Board. Each quarter management reports to the Audit Committee on legal, finance, accounting and tax matters. Our Board is provided with reports on legal matters at least quarterly and on other matters related to risk oversight on an as needed basis.

155.    Regarding the Company's Code of Ethics, the 2025 Proxy Statement stated the following:

> We have adopted a Code of Business Conduct and Ethics, which applies to all directors, officers and employees, including the principal executive officer, principal financial and accounting officer and controller. The purpose of the Code is to promote honest and ethical conduct. The Code of Business Conduct and Ethics is available on our website and is also available in print, without charge, upon written request to our corporate secretary at 660 W. Germantown Pike, Suite 110, Plymouth Meeting, Pennsylvania 19462. Any amendments to or waivers of the Code of Business Conduct and Ethics will be promptly posted on our website at www.inovio.com or in a report on Form 8-K, as required by applicable laws.

156.    Regarding the Company's Audit Committee, the 2025 Proxy Statement notes its responsibilities as follows, in relevant part:

> The functions of the Audit Committee include retaining our independent registered public accounting firm, reviewing its independence, reviewing and approving the planned scope of our annual audit, reviewing and approving any fee arrangements with our independent registered public accounting firm, overseeing its audit work, reviewing and pre-approving any non-audit services that may be performed by it, reviewing the adequacy of accounting and financial controls, reviewing our critical accounting policies and reviewing and approving any related party transactions. The Audit Committee acts pursuant to a written charter that is available on our corporate website at: http://www.inovio.com.

157.    Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia:* (1) the Company failed to maintain internal controls; (2) as a result, the Company lacked sufficient research to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (3) the INO-3107 BLA would be unlikely to receive accelerated approval or priority review from the FDA; (4) INO-3107's financial prospects were greatly exaggerated; and (5) as a result, the Company's overall financial assertions were inaccurate. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

158.    The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

159.    As a result of Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth to the Board; (2) ratify the appointment of Ernst & Young as the Company's independent registered public accounting firm for the year ended December 31, 2025; (3) approve, on an advisory basis, the compensation of the Company's named executive officers; and (4) approve the 2025 Amendment of the 2023 Omnibus Incentive Plan.

160.    As the result of shareholders voting to approve the 2025 Amendment of the 2023 Omnibus Incentive Plan, an additional 2,200,000 shares were made available for grant.

### *May 13, 2025 Press Release and Form 10-Q*

161.    On May 13, 2025, the Company issued a press release to announce its financial results for the first quarter of 2025 (the "Q1 2025 Press Release"). The Q1 2025 Press Release stated the following, in relevant part:

> • *Clinical and immunological results from Phase 1/2 trial of INO-3107 published in Nature Communications in February 2025*
> > • *INO-3107 induced new populations of T cells in the blood that traveled to airway tissue and were associated with significant clinical benefit as measured by reduced need for surgery*

*       *       *

INOVIO plans to begin rolling submission of the BLA in mid-2025 under FDA's accelerated approval program, subject to FDA concurrence, with the goal of completing the submission in the second half of 2025 and receiving FDA acceptance of the submission by the end of the year. FDA has previously awarded breakthrough therapy designation for INO-3107 and INOVIO plans to request priority review of its BLA, which if granted would allow for an FDA approval decision (PDUFA date) in mid-2026.

(Emphasis in original).

162.    The Q1 2025 Press Release also quoted Defendant Shea as stating the following, in

relevant part:

As previously stated, our goal is to begin rolling submission in mid-2025, complete the submission in the second half of 2025 and receive file acceptance from the FDA by year end. If we receive priority review, it could allow for a PDUFA date in mid-2026 . . . . ***Based on market research, we believe INO-3107 could be the preferred product for patients and providers***, if approved.

163.    Also on May 13, 2025, the Company filed its quarterly report on Form 10-Q with

the SEC for the first quarter of 2025, signed by Defendants Shea and Kies (the "Q1 2025 10-Q").

Attached to the Q1 2025 10-Q were SOX certifications signed by Defendants Shea and Kies,

certifying that the Q1 2025 10-Q "does not contain any untrue statement of a material fact or omit

to state a material fact necessary to make the statements made, in light of the circumstances under

which such statements were made, not misleading with respect to the period covered by this report"

and that the "information contained in the [Q1 2025 10-Q] fairly presents, in all material respects,

the financial condition and results of operations of the Company."

164.    The Q1 2025 10-Q also contained the same boilerplate provisions pertaining to risk

warnings as noted in the Q3 2023 10-Q. *Supra* ¶ 107.

***August 12, 2025 Press Release and Form 10-Q***

165.    On August 12, 2025, the Company issued a press release to announce its financial results for the second quarter of 2025 (the "Q2 2025 Press Release"). The Q2 2025 Press Release stated the following, in relevant part:

> INOVIO completed the DV [design verification] testing for the CELLECTRA 5PSP device and requested in July 2025 that the FDA allow it to begin submitting its BLA on a rolling basis based on the Breakthrough Therapy designation previously granted to INO-3107. INOVIO anticipates completing its submission over the next several months and requesting a priority review. FDA inspection of INOVIO as clinical sponsor of the Phase 1/2 trial was successfully completed. The company is working on the device-related sections for its BLA and updating its active IND [Investigational New Drug application] so it can begin enrolling patients into its placebo-controlled, randomized confirmatory trial, which will include 100 patients and be conducted at approximately 20 sites across the United States.
>
> Data from a retrospective study (RRP-002) investigating the long-term clinical efficacy of patients treated with INO-3107 have been published in a peer-reviewed journal, *The Laryngoscope*. The data demonstrate that INO-3107 provided significant clinical benefit to RRP patients, as measured by reduction in surgery, that continued to improve in years two and three following initial treatment.

(Emphasis in original).

166.    That same day, the Company filed its quarterly report on Form 10-Q with the SEC for the second quarter of 2025, signed by Defendants Shea and Kies (the "Q2 2025 10-Q"). Attached to the Q2 2025 10-Q were SOX certifications signed by Defendants Shea and Kies, certifying that the Q2 2025 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that the "information contained in the [Q2 2025 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

167.    The Q2 2025 10-Q also contained the same boilerplate provisions pertaining to risk warnings as noted in the Q3 2023 10-Q. *Supra* ¶ 107.

***August 26, 2025 Press Release***

168.   On August 26, 2025, the Company issued a press release regarding the submission timeline for the INO-3107 BLA (the "August 2025 INO-3107 Press Release"). The August 2025 INO-3107 Press Release "announced that the FDA has notified INOVIO that it agrees with its rolling submission timeline for the BLA for INO-3107 as a treatment for adults with [RRP.]" and that the Company "anticipates completing its submission to the FDA in the coming months and requesting priority review, with the goal of file acceptance by the FDA by the end of 2025."

169.   The August 2025 INO-3107 Press Release also quoted Defendant Shea as stating the following:

> We are pleased the FDA agreed to our rolling submission plan. ***We are also encouraged by their recent activity in recognizing the importance of accelerating the full approval of new technologies that can bring life-changing therapeutic options to patients suffering from rare diseases such as RRP*** . . . . ***Based on the totality of our data, we believe INO-3107 has the potential to become the preferred product for the treatment of RRP by patients and providers.*** We are leveraging our Breakthrough Therapy designation for INO-3107 to continue discussions with the FDA on the pathway to approval as we aim to bring our positively differentiated therapeutic option to patients as quickly as possible.

***November 3, 2025 Press Release***

170.   On November 3, 2025, the Company issued a press release regarding its rolling submission of the INO-3107 BLA (the "November 2025 INO-3107 Press Release"). The November 2025 INO-3107 Press Release stated the following, in relevant part:

> • *[RRP] is a rare HPV-related disease of the respiratory tract with significant unmet need*
> • *INO-3107 previously received Orphan Drug and Breakthrough Therapy designations; BLA submitted under FDA's Accelerated Approval program*
> • *Expect to receive file acceptance by year end 2025 with potential PDUFA date in mid-2026 if request for priority review granted*
>
> \* \* \*
>
> INOVIO submitted the BLA under the FDA's Accelerated Approval program and has requested a priority review, which if granted, is expected to be completed within six months following the 60-day filing period. If approved, INO-3107 would be

INOVIO's first commercial product and the first DNA medicine available in the United States.

(Emphasis in original).

***November 10, 2025 Press Release and Form 10-Q***

171.    On November 10, 2025, the Company issued a press release to announce its financial results for the third quarter of 2025 (the "Q3 2025 Press Release"). The Q3 2025 Press Release stated that the Company had "submitted the BLA under the FDA's accelerated approval program and has requested a priority review, which if granted, is expected to be completed within six months following file acceptance."

172.    The Q3 2025 Press Release also quoted Defendant Shea as stating the following, in relevant part:

> I'm very pleased to report that we've completed the rolling submission of our BLA for lead candidate INO-3107. We believe every patient deserves a treatment that reduces exposure to surgery and ***INO-3107 has the potential to meet that significant need in the RRP community***. The majority of patients in our Phase 1/2 trial needed fewer surgeries after treatment and showed continued improvement through Year 2 ***without additional doses, and without surgical interventions during the treatment window to maintain minimal residual disease as required by other treatment modalities***[.]

173.    Also on November 10, 2025, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter of 2025 (the "Q3 2025 10-Q"). Attached to the Q3 2025 10-Q were SOX certifications signed by Defendants Shea and Kies, certifying that the Q3 2025 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that the "information contained in the [Q3 2025 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

174.    The Q3 205 10-Q stated the following, in relevant part:

Utilizing our breakthrough therapy designation, we requested rolling submission of our [INO-3107] BLA in July 2025 and reported in November 2025 that we had completed the BLA submission, with the goal of receiving file acceptance by the FDA by the end of 2025. We have requested a priority review from the FDA, which, if granted, is expected to be completed within six months following the 60-day filing period.

During 2025, we have presented key data regarding INO-3107 at several scientific conferences. Highlights from the data include:

• 81% (26/32) of patients experienced a reduction of one or more surgeries at Year 1 post-treatment

• By the end of Year 2, 91% (21/23) of evaluable patients continued to experience a reduction of one or more surgeries. Only two patients had not yet responded to treatment with INO-3107

• INO-3107 demonstrated continued clinical benefit, with a persistent decline in the mean number of surgeries through Year 2 post-therapy: A 78% reduction in mean annual surgeries was seen at Year 2 compared to the 1 year pre-treatment period (0.9, n=28 vs 4.1, n=32)

• Clinical response was not dependent upon low viral loads, molecular subtype or other elements of the papilloma microenvironment

175.    The Q3 2025 10-Q also contained the same boilerplate provisions pertaining to risk warnings as noted in the Q3 2023 10-Q. *Supra* ¶ 107.

176.    The statements contained in ¶¶ 161-175 were materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company failed to maintain internal controls; (2) as a result, the Company lacked sufficient research to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (3) the INO-3107 BLA would be unlikely to receive accelerated approval or priority review from the FDA; (4) INO-3107's financial prospects were greatly exaggerated; and (5) as a result, the Company's overall financial

assertions were inaccurate. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## THE TRUTH EMERGES

### December 26, 2025 Press Release

177.    The truth finally emerged on December 29, 2025, before the market opened, when the Company issued the December 2025 INO-3107 Press Release. The December 2025 INO-3107 Press Release reported that the FDA had accepted the INO-3107 BLA on the standard timeline as opposed to an accelerated timeline. Additionally, the December 2025 INO-3107 Press Release conceded that that FDA signaled that Inovio had not provided sufficient information to merit approval for an accelerated timeline. Nevertheless, the December 2025 INO-3107 Press Release reported that the Company would not seek approval under the standard timeline for review and would instead seek a meeting with the FDA to achieve accelerated approval.

178.    More specifically, the December 2025 INO-3107 Press Release stated the following, in relevant part:

> [T]he [FDA] accepted the company's [BLA] for INO-3107 for review as a potential treatment for adults with RRP. ***The review classification designated by FDA is Standard.***
>
> ***The FDA assigned INO-3107 a Prescription Drug User Fee Act (PDUFA) review goal date of October 30, 2026***, which is the date by which it intends to take action on the application. The FDA has indicated that it is not currently planning to hold an advisory committee meeting to discuss this application.
>
> ***INOVIO filed its BLA under the accelerated approval pathway. In the file acceptance letter, the FDA noted as a potential review issue its preliminary conclusion that the company has not submitted adequate information to justify eligibility for the accelerated approval pathway.*** INOVIO continues to believe that INO-3107 provides a meaningful therapeutic benefit over existing treatments and fulfills the criteria for accelerated approval. INOVIO plans to request a meeting with FDA to discuss next steps to remain eligible under the accelerated approval program. INOVIO is not currently planning to seek approval for INO-3107 under the traditional pathway.

179.     On this news, the price of the Company's stock fell $0.56 per share, or approximately 24.5%, from a close of $2.29 per share on December 26, 2025, to close at $1.73 per share on December 29, 2025.

## DAMAGES TO INOVIO

180.     As a direct and proximate result of the Individual Defendants' conduct, Inovio has lost and expended, and will continue to lose and expend, many millions of dollars.

181.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action filed against the Company, its CEO, and its CFO and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

182.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

183.     Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

184.     Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments paid to the Individual Defendants who breached their fiduciary duties to the Company.

185.     As a direct and proximate result of the Individual Defendants' conduct, Inovio has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount"

that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## DERIVATIVE ALLEGATIONS

186.    Plaintiff brings this action derivatively and for the benefit of Inovio to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Inovio, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

187.    Inovio is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

188.    Plaintiff is, and has been at all relevant times, a shareholder of Inovio. Plaintiff will adequately and fairly represent the interests of Inovio in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

189.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

190.    A pre-suit demand on the Board of Inovio is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Director-Defendants that were on the Board at the time this action was commenced.

191.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

192.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls while two of the Individual Defendants engaged in lucrative insider sales netting proceeds of approximately $276,363. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and this excused.

193.    In addition, the Director-Defendant caused the 2025 Proxy Statement to call for a shareholder vote to approve the 2025 Amendment of the 2023 Omnibus Incentive Plan, thereby increasing the number of shares available for issuance thereunder by 2,200,000 shares. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2025 Amendment of the 2023 Omnibus Incentive Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2025 Amendment of the 2023 Omnibus Incentive Plan at the annual meeting of the stockholders on May 20, 2025, there were 24,460 shares available for issuance under the 2023 Omnibus Incentive Plan. For this reason, the Individual Defendants, including the Director-Defendants, received material personal

benefits that they otherwise would not receive but for the issuance of the 2025 Proxy Statement and the shareholders approving the 2025 Amendment of the 2023 Omnibus Incentive Plan that made an additional 2,200,000 shares available under the Plan. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

194.    Additional reasons that demand on Defendant Shea is futile follow. Defendant Shea has served as the Company's CEO since May 2022 and as a Company director since 2022. Previously, Defendant Shea served as the Company's COO from 2019 to May 2022. The Company provides Defendant Shea with her principal occupation, for which the Company compensates her handsomely. Thus, as the Company admits, she is not an independent director. As the Company's highest officer, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Defendant Shea signed the false and misleading Forms 10-Q and 10-K filed by the Company during the Relevant Period and referred to above, as well as the associated SOX certifications. Defendant Shea solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Shea also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2023 Omnibus Incentive Plan. Moreover, under the 2025

Amendment of the 2023 Omnibus Incentive Plan, Defendant Shea is eligible to receive stock awards under the 2025 Amendment of the 2023 Omnibus Incentive Plan, thereby materially benefitting from the adoption of the 2025 Amendment of the 2023 Omnibus Incentive Plan. Defendant Shea's insider sales while the Company's stock was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the scheme. Moreover, Defendant Shea is a defendant in the Securities Class Action. For these reasons too, Defendant Shea breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

195.    Additional reasons that demand on Defendant Benito is futile follow. Defendant Benito has served as the Chairman of the Board since January 3, 2019, and as a Company director since 2003. Defendant Benito currently serves as the Chair of the Nomination and Corporate Governance Committee, as a member of the Audit Committee, and as a member of the Compensation Committee. The Company provides Defendant Benito with handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Benito signed the false and misleading 2023 and 2024 Form 10-Ks. Defendant Benito solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Benito also solicited the 2025 Proxy Statement, which contained false and misleading statements

and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2023 Omnibus Incentive Plan. Moreover, under the 2025 Amendment of the 2023 Omnibus Incentive Plan, Defendant Benito is eligible to receive stock awards under the 2025 Amendment of the 2023 Omnibus Incentive Plan, thereby materially benefiting from the adoption of the 2025 Amendment of the 2023 Omnibus Incentive Plan. For these reasons, too, Defendant Benito breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

196.    Additional reasons that demand on Defendant Dansey is futile follow. Defendant Dansey has served as a Company director since 2021. Defendant Dansey currently serves as a member of the Nomination and Corporate Governance Committee. The Company provides Defendant Dansey with handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Dansey signed the false and misleading 2023 and 2024 Form 10-Ks. Defendant Dansey solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Dansey also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2023 Omnibus Incentive Plan. Moreover, under

Case 2:26-cv-01426-JP   Document 1   Filed 03/05/26   Page 62 of 80

the 2025 Amendment of the 2023 Omnibus Incentive Plan, Defendant Dansey is eligible to receive stock awards under the 2025 Amendment of the 2023 Omnibus Incentive Plan, thereby materially benefitting from the adoption of the 2025 Amendment of the 2023 Omnibus Incentive Plan. For these reasons, too, Defendant Dansey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

197.    Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since 2019. Defendant Miller previously served as a member of the Compensation Committee. The Company provides Defendant Miller with handsome compensation for her role as a director. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Miller signed the false and misleading 2023 and 2024 Form 10-Ks. Defendant Miller solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Miller also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2023 Omnibus Incentive Plan. Moreover, under the 2025 Amendment of the 2023 Omnibus Incentive Plan, Defendant Miller is eligible to receive stock awards under the 2025 Amendment of the 2023 Omnibus Incentive Plan, thereby materially benefitting from the

adoption of the 2025 Amendment of the 2023 Omnibus Incentive Plan. For these reasons, too, Defendant Miller breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

198.    Additional reasons that demand on Defendant Shepard is futile follow. Defendant Shepard has served as a Company director since 2020. Defendant Shepard currently serves as a member of the Audit Committee and as a member of the Nomination & Corporate Governance Committee.  The Company provides Defendant Shepard with handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Shepard signed the false and misleading 2023 and 2024 Form 10-Ks. Defendant Shepard solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Shepard also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2023 Omnibus Incentive Plan. Moreover, under the 2025 Amendment of the 2023 Omnibus Incentive Plan, Defendant Shepard is eligible to receive stock awards under the 2025 Amendment of the 2023 Omnibus Incentive Plan, thereby materially benefitting from the adoption of the 2025 Amendment of the 2023 Omnibus Incentive Plan. For these reasons, too, Defendant Shepard

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

199.    Additional reasons that demand on Defendant Weiner is futile follow. Defendant Weiner has served as a Company director since 2016. According to the 2025 Proxy Statement, Defendant Weiner previously served as the Chairman of the Company's Scientific Advisory Board, for which he received over $120,000 from the Company during the year ended December 31, 2022. Thus, as the Company admits, he is not an independent director. The Company provides Defendant Weiner with handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Weiner signed the false and misleading 2023 and 2024 Form 10-Ks. Defendant Weiner solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Weiner also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2023 Omnibus Incentive Plan. Moreover, under the 2025 Amendment of the 2023 Omnibus Incentive Plan, Defendant Weiner is eligible to receive stock awards under the 2025 Amendment of the 2023 Omnibus Incentive Plan, thereby materially benefitting from the adoption of the 2025 Amendment of the 2023 Omnibus Incentive Plan. For these reasons, too, Defendant Weiner breached his fiduciary duties, faces a substantial likelihood

of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

200.    Additional reasons that demand on Defendant Yarno is futile follow. Defendant Yarno has served as a Company director since 2017. Defendant Yarno currently serves as the Chair of the Compensation Committee and as a member of the Nomination and Corporate Governance Committee. The Company provides Defendant Yarno with handsome compensation for her role as a director. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Yarno signed the false and misleading 2023 and 2024 Form 10-Ks. Defendant Yarno solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Yarno also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2023 Omnibus Incentive Plan. Moreover, under the 2025 Amendment of the 2023 Omnibus Incentive Plan, Defendant Yarno is eligible to receive stock awards under the 2025 Amendment of the 2023 Omnibus Incentive Plan, thereby materially benefitting from the adoption of the 2025 Amendment of the 2023 Omnibus Incentive Plan. For these reasons, too, Defendant Yarno breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

201.    Additional reasons that demand on Defendant Zoth is futile follow. Defendant Zoth has served as a Company director since 2019. Defendant Zoth currently serves as the Chair of the Audit Committee and as a member of the Compensation Committee. The Company provides Defendant Zoth with handsome compensation for her role as a director. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Zoth signed the false and misleading 2023 and 2024 Form 10-Ks. Defendant Zoth solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Zoth also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2023 Omnibus Incentive Plan. Moreover, under the 2025 Amendment of the 2023 Omnibus Incentive Plan, Defendant Zoth is eligible to receive stock awards under the 2025 Amendment of the 2023 Omnibus Incentive Plan, thereby materially benefitting from the adoption of the 2025 Amendment of the 2023 Omnibus Incentive Plan. For these reasons, too, Defendant Zoth breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

202.    Additional reasons that demand on the Board is futile follow.

203.     Defendants Zoth (as Chair), Benito, and Shepard (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

204.     In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Director-Defendants failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

205.    Inovio has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Inovio any part of the damages Inovio suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

206.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

207.    The acts complained of herein constitute violations of fiduciary duties owed by Inovio's officers and directors, and these acts are incapable of ratification.

208.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Inovio. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Inovio, there would be no

directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

209.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Inovio to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

210.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM
**Against the Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth for Violations of Section 14(a) of the Securities Exchange Act of 1934**

211.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

213.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

214.    Under the direction and watch of the Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

215.    The 2024 Proxy Statement also failed to disclose that: (1) the Company failed to maintain internal controls; (2) as a result, the Company lacked sufficient research to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (3) the INO-3107 BLA would be unlikely to receive accelerated approval or priority review from the FDA; (4) INO-3107's financial prospects were greatly exaggerated; and (5) as a result, the Company's overall financial assertions were inaccurate. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

216.    In the exercise of reasonable care, Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff

in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement including, but not limited to, the re-election of the Director-Defendants.

217.    As a result of Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Ernst & Young as the Company's independent registered public accounting firm for the year ended December 31, 2024; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

218.    Under the direction and watch of the Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth, the 2025 Proxy Statement failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

219.    The 2025 Proxy Statement also failed to disclose that: (1) the Company failed to maintain internal controls; (2) as a result, the Company lacked sufficient research to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (3) the INO-3107 BLA would be unlikely to receive accelerated approval or priority review from the FDA; (4) INO-3107's financial prospects were greatly exaggerated; and (5) as a result, the Company's overall financial assertions were inaccurate. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

220.    In the exercise of reasonable care, Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement including, but not limited to, the re-election of the Director-Defendants and approval of the 2025 Amendment of the 2023 Omnibus Incentive Plan.

221.    As a result of Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Ernst & Young as the Company's independent registered public accounting firm for the year ended December 31, 2025; (3) approve, on an advisory basis, the compensation of the Company's named executive officers; and (4) approve the 2025 Amendment of the 2023 Omnibus Incentive Plan.

222.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 and 2025 Proxy Statements.

223.    Plaintiff, on behalf of Inovio, has no adequate remedy at law.

### SECOND CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

224.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

225.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Inovio's business and affairs.

226. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

227. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Inovio.

228. In breach of their fiduciary duties owed to Inovio, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company failed to maintain internal controls; (2) as a result, the Company lacked sufficient research to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (3) the INO-3107 BLA would be unlikely to receive accelerated approval or priority review from the FDA; (4) INO-3107's financial prospects were greatly exaggerated; and (5) as a result, the Company's overall financial assertions were inaccurate. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

229. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

230. Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls, while two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $276,363.

231.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Inovio's securities.

232.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Inovio's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

233.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

234.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Inovio has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

235.    Plaintiff, on behalf of Inovio, has no adequate remedy at law.

**<u>THIRD CLAIM</u>**
**Against the Individual Defendants for Unjust Enrichment**

236.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

237.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Inovio.

238.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Inovio that was tied to the performance or artificially inflated valuation of Inovio or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

239.    Plaintiff, as a shareholder and a representative of Inovio, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

240.    Plaintiff, on behalf of Inovio, has no adequate remedy at law.

**<u>FOURTH CLAIM</u>**
**Against the Individual Defendants for Abuse of Control**

241.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

242.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Inovio, for which they are legally responsible.

243.    As a direct and proximate result of the Individual Defendants' abuse of control, Inovio has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Inovio has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

244.    Plaintiff, on behalf of Inovio, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

245.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

246.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Inovio in a manner consistent with the operations of a publicly held corporation.

247.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Inovio has sustained and will continue to sustain significant damages.

248.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

249.    Plaintiff, on behalf of Inovio, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

250.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

251.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

252.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Inovio to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, to be subject to investigations and civil inquiries, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

253.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

254.    Plaintiff, on behalf of Inovio, has no adequate remedy at law.

### SEVENTH CLAIM
**Against Defendants Shea and Kies for Contribution Under Sections 10(b) and 21D of the Exchange Act**

255.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

256.    Inovio and Defendants Shea and Kies are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Shea's and Kies' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

257.    Defendants Shea and Kies, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise

control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

258.    Accordingly, Defendants Shea and Kies are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

259.    As such, Inovio is entitled to receive all appropriate contribution or indemnification from Defendants Shea and Kies.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Inovio, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Inovio;

(c)    Determining and awarding to Inovio the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Inovio and the Individual Defendants to take all necessary actions to reform and improve Inovio's corporate governance and internal procedures to comply with applicable laws and to protect Inovio and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Inovio to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Inovio restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: March 5, 2026

**THE BROWN LAW FIRM, P.C.**

*/s/Elizabeth Donohoe*
Elizabeth Donohoe
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Han Shin, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 4th day of March 2026.

Signed by:

*Han Shin*

9EB9BE5BBEA140F...

Han Shin